1

2

3

4

5

6

7                      UNITED STATES DISTRICT COURT

8                      EASTERN DISTRICT OF CALIFORNIA

9

10   VALENTINE E. UNDERWOOD,              CASE NO. 1:11-cv-1710-LJO-MJS (PC)

11              Plaintiff,                **ORDER DISMISSING COMPLAINT WITH
                                          LEAVE TO AMEND**
12        v.
                                          **(ECF NO. 1)**
13   F. GONZALEZ, et al.,
                                          **THIRTY (30) DAY DEADLINE**
14              Defendants.

15

16

17         Plaintiff is a state prisoner proceeding pro se in this civil rights action brought

18   pursuant to 42 U.S.C. § 1983. (ECF No. 1.) His complaint is before the Court for

19   screening.

20   **I.    SCREENING REQUIREMENT**

21         The Court is required to screen complaints brought by prisoners seeking relief

22   against a governmental entity or officer or employee of a governmental entity.  28 U.S.C.

23   § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has

24   raised claims that are legally "frivolous, malicious," or that fail to state a claim upon which

25   relief may be granted, or that seek monetary relief from a defendant who is immune from

26   such relief. 28 U.S.C. § 1915A(b)(1), (2).

27

28

## II.   PLEADING STANDARD

Section 1983 "provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere. Graham v. Connor, 490 U.S. 386, 393-94 (1989).

To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Ketchum v. Alameda Cnty., 811 F.2d 1243, 1245 (9th Cir. 1987).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. Facial plausibility demands more than the mere possibility that a defendant committed misconduct and, while factual allegations are accepted as true, legal conclusions are not. Id. at 677-78.

## III.   PLAINTIFF'S ALLEGATIONS

Plaintiff is incarcerated at Salinas Valley State Prison, but complains of acts that occurred at California Correctional Institution ("CCI"). He names the following Defendants in their individual and official capacities: (1) Warden F. Gonzalez, (2) Associate Warden M. Carrasco, (3) Investigative Services Unit Captain J. Gutierrez, (4) I.G.I. Lieutenant J. Gentry, (5) I.G.I. Sergeant L. Machado, (6) I.G.I. Correctional Officer

1  Sigston, (7) I.G.I. Correctional Officer T. Turmezi, (8) Correctional Officer M. Robinson,

2  and (9) Correctional Officer Foster.

3       Plaintiff was validated as a member of the Black Guerilla Family ("BGF") gang on

4  December 16, 2008. He alleges the validation was in retaliation for the exercise of his

5  First Amendment rights and also violated his Fourteenth Amendment Due Process

6  rights. He seeks an order reassigning him from the Security Housing Unit ("SHU") to the

7  general population, the removal of harmful documents pertaining to validation from his

8  central file, money damages, and "all necessary changes" to correct the violations of his

9  rights.

10      Plaintiff provides a lengthy list of facts relating to events occurring over more than

11  a two year period that he believes support his claims. He also provides approximately

12  200 pages of exhibits in support of his complaint. Although the relevance of some of

13  these facts and exhibits is difficult to ascertain, Plaintiff's essential allegations are

14  nonetheless detailed as accurately as possible below.

15      On November 21, 2006, Plaintiff was involved in an altercation with correctional

16  officers at Kern Valley State Prison. He was assessed a Security Housing Unit ("SHU")

17  term and transferred to the SHU at CCI.

18      On March 20, 2007, Plaintiff appeared before an Institutional Classification

19  Committee ("ICC") chaired by Defendant Gonzalez. Defendant Gonzalez stated that the

20  length of Plaintiff's SHU term was correct. Correctional Counselor Torres (not a

21  defendant) discussed placing Plaintiff in the Behavior Modified Unit ("BMU"). Defendant

22  Gonzalez stated Plaintiff was not "BMU qualified."

23      In May 2007, Plaintiff again appeared before an ICC chaired by Defendant

24  Gonzalez. Torres again raised the possibility of BMU placement, and Gonzalez again

25  stated Plaintiff was not BMU qualified. Gonzalez asked Plaintiff if he would like to stay on

26  the CCI general population yard at the conclusion of his SHU term because Plaintiff's

27  wife lived nearby. Plaintiff agreed.

28

On May 21, 2007 Plaintiff's SHU term concluded. Plaintiff received notice he was being placed in the Administrative Segregation Unit ("ASU") pending available bed space in the general population yard.

On June 5, 2007, Plaintiff appeared before an unscheduled ICC chaired by Defendant Carrasco.

On June 20, 2007, Plaintiff wrote Defendant Gonzalez regarding his ASU housing and asked that he be moved to general population and issued his property.

On June 28, 2007, Defendant Carrasco responded, stating that there was no available bed space in the general population.

On July 5, 2007, Plaintiff was moved to the general population and issued his property.

On July 6, 2007, Plaintiff appeared before an ICC. He subsequently was taken to the BMU and denied all property.

On July 10, 2007, Plaintiff wrote Defendant Gonzalez asking to be removed from the BMU. He reminded Gonzalez that he previously determined Plaintiff was not BMU qualified.

On July 11, 2007, Plaintiff submitted an administrative appeal contesting his BMU placement. His appeal was returned unprocessed.

On July 17, 2007, Plaintiff received a response from Defendant Carrasco regarding his July 10, 2007 letter. Carrasco stated that Plaintiff's request to be removed from BMU was denied based on Plaintiff being found guilty of a Rules Violation Report (RVR) for an November 21, 2006 altercation with a correctional officer. Although Plaintiff contested the RVR, it was not overturned.

On July 27, 2007, Plaintiff was escorted to "R&R" to receive his BMU-eligible property. Defendant Robinson denied Plaintiff his law books. Robinson also slammed a draft of Plaintiff's civil rights complaint on the table.

4

On July 29, 2007, Plaintiff submitted a 602 appeal regarding the denial of his law books.

On October 6, 2007, Plaintiff was released from BMU to the general population.

On November 21, 2007, Plaintiff received the second level response denying his 602 regarding his law books. Also on November 21, 2007, a confidential memorandum was produced that eventually was relied on in Plaintiff's gang validation.

In November or December of 2007, Plaintiff went to R&R to pick up an order of Islamic oils. Defendants Sigston and Robinson were issuing religious supplies. Defendant was missing one of his oils. When he asked about the oil, he was told, "You got what you are getting." Plaintiff submitted a 602 appeal but received no response. Thereafter, Defendant Sigston became an Institutional Gang Investigator.

On December 17, 2007, Plaintiff submitted a 602 medical appeal.

On March 4, 2008, Defendant Sigston searched Plaintiff's cell. Plaintiff's property and his cellmate's property were co-mingled. Plaintiff's legal paperwork, draft civil rights complaint, phone book, photos, and other property were taken.

On March 10, 2008, Plaintiff submitted a 602 administrative appeal regarding his property. Defendant Sigston returned the appeal to Plaintiff stating, "Gang Training Material Confiscated." When Plaintiff's legal property was returned, several pages of a witness affidavit pertaining to another case had been highlighted.

On April 3, 2008, Plaintiff submitted a 602 appeal regarding being denied law library access.

On April 5, 2008, Plaintiff's institution was placed on lockdown.

On April 30, 2008, Plaintiff's cell was searched and his religious books were confiscated. His civil rights complaint was spread out on his bed.

On June 23, 2008, Plaintiff filed a civil rights complaint in an unrelated case.

On June 24, 2008, Plaintiff wrote the Prison Law Office requesting assistance in getting medical care.

On June 25, 2008, Plaintiff wrote the Department of Justice requesting assistance in getting medical care.

On June 29, 2009, Plaintiff submitted a 602 appeal regarding his religious books being confiscated and then lost.

On July 28, 2008, Plaintiff received a response from the Prison Law Office.

On August 3, 2008, Plaintiff submitted a 602 regarding the denial of law library access.

On August 7, 2008, Plaintiff's cell was searched, his legal papers were taken, and a list of Defendants was taken from his cell.

On August 10, 2008, Plaintiff submitted a 602 appeal regarding his missing legal papers. The appeal was returned for Plaintiff to seek an informal response.

On August 13, 2008, Plaintiff sent a copy of one of his medical 602s to the Prison Law Office.

On August 25, 2008, Plaintiff resubmitted his 602 regarding missing legal papers. Plaintiff complained to Correctional Officer Erwin (not a defendant), and was told, "Leave it alone, your already on thin ice."

On or about August 25, 2008, Defendant Machado interviewed Plaintiff regarding his March 10, 2008 appeal regarding the alleged confiscation of gang material. Machado informed Plaintiff that the gang material was a picture of a man with chains around his neck in front of an African map.

Also on August 25, 2008, Plaintiff received a response from the Prison Law Office regarding his medical issues.

On August 28, 2008, Defendant Foster discussed with Plaintiff compensation for the religious books that had been confiscated during a cell search. Foster stated that he would get items to compensate Plaintiff and would be right back. Later that day, Correctional Officer Hutton (not a defendant) told Plaintiff the lieutenant wanted to speak to him. Plaintiff was handcuffed, escorted outside, and told by Defendants Turmezi and

Sigston that he was being placed in ASU. They stated, "We got what we want today Underwood, you'll get what you want tomorrow."

On August 29, 2008, Plaintiff was transferred to Bakersfield for a biopsy.

On September 1, 2008 Plaintiff wrote the Prison Law Office requesting information regarding retaliation and the gang validation process.

On September 2, 2008, Plaintiff was given three source items being used against him in the gang validation process, three confidential memoranda, and a CDCR 128B chrono.

On September 3, 2008, Plaintiff received a Prison Focus Magazine titled "Black August We Will Never Forget" in the mail.

On September 4, 2008, Plaintiff appeared before an ICC chaired by Defendant Carrasco. Plaintiff complained of retaliation. He requested a response from Defendant Machado to his 602 regarding the alleged gang materials. Defendant Carrasco stated, "she has more important things to do."

Also on September 4, 2008, Plaintiff was interviewed by Defendant Turmezi. Plaintiff explained that he had never been a member of a gang. Turmezi showed Plaintiff a green sheet of Black August material allegedly found in Plaintiff's property. Plaintiff explained his Black August material was on white paper. Turmezi would not allow Plaintiff to see the material, stating it was confidential. Turmezi stated, "Black August material is BGF Material." Plaintiff mentioned the magazine titled, "Black August We Will Never Forget." Turmezi and five or six other officers started laughing. Plaintiff submitted written statements contesting the three source items used in his validation.

Also on September 4, 2008, Plaintiff wrote Defendant Gonzalez about not being issued his legal property.

On September 6, 2008, Plaintiff wrote Prison Focus Magazine regarding the use of Black August material to validate Plaintiff as a BGF member.

On September 8, 2008, Plaintiff submitted a 602 regarding his ASU placement.

On September 10, 2008, Plaintiff received a response from Defendant Carrasco to his September 4, 2008 letter. Carrasco stated Plaintiff received his property on September 8, 2008.

Plaintiff received his property on September 11, 2008.

On September 12, 2008, Plaintiff received a letter from the Prison Law Office notifying him that they wrote the Attorney General regarding Plaintiff's medical needs.

On September 15, 2008, Plaintiff submitted a 602 appeal requesting a polygraph regarding his alleged gang affiliation.

On September 20, 2008, Plaintiff appeared before an ICC. He argued that the gang validation process was retaliatory. Defendant Carrasco refused to assist Plaintiff in getting a response to his 602 regarding the confiscation of alleged gang material from his cell.

On October 6, 2008, Plaintiff received a letter from the Prison Law Office regarding his medical care.

On October 9, 2008, Plaintiff received a letter from Prison Focus Magazine.

On October 15, 2008, Plaintiff resubmitted a 602 appeal regarding his property being co-mingled with his cell mate's when the alleged gang material was found. His appeal was denied processing.

On October 27, 2008, Plaintiff received a response to his 602 requesting a polygraph.

On October 29, 2008, Plaintiff was taken for an MRI and spoke with Defendant Foster during transport. He asked why his inmate request slip stated, "Lieutenant said no to compensating me," yet the appeal log stated Plaintiff was compensated. Foster stated, "Oh well."  Plaintiff stated, "I'll address this with the Courts." Foster responded, "that's your problem now Underwood, ever since you got that typewriter, you've been suing everyone. That's why your where you are now."

On November 2, 2008, Plaintiff wrote Defendant Gutierrez and requested an interview to explain his 602 regarding the search of his property and requesting that Defendant Machado be instructed to forward a response.

On November 3, 2008, Plaintiff forwarded his 602 request for a polygraph to the appeals coordinator.

On November 17, 2008, Plaintiff submitted a request to Defendant Gentry to instruct Defendant Machado to respond to Plaintiff's 602.

Also on November 17, 2008, Plaintiff received a response from the appeals coordinator regarding his request for a polygraph.

On November 20, 2008, Plaintiff received a response from Defendant Gentry.

On November 23, 2008, Plaintiff submitted a 602 complaint against Defendant Machado that was denied processing.

On November 24, 2008, Plaintiff received a response from Defendant Gutierrez instructing him to resubmit his 602.

On December 16, 2008, the Office of Correctional Safety validated Plaintiff as an associate of the BGF with an active/inactive review eligibility date of March 14, 2014. Plaintiff received notice of the validation on December 29, 2008.

On January 5, 2009, Plaintiff resubmitted his complaint against Defendant Machado to the appeals coordinator.

On January 22, 2009, Plaintiff appeared before an ICC chaired by Defendant Carrasco. Plaintiff asked about his claims of retaliation and Carrasco stated, "when are you going to realize you have nothing coming before me." She informed Plaintiff that he had been validated and asked if he wanted to debrief. Plaintiff stated he could not debrief because he was not a gang member or associate. Carrasco stated that Plaintiff would be housed with other validated gang members. Plaintiff refused to be celled with a gang member. Carrasco stated that he would be getting a cellmate. Plaintiff stated that doing so would lead to "a situation." Carrasco again stated he would have a cell mate.

9

Plaintiff stated there would be a "crime scene" in the cell. Carrasco then stated Plaintiff would be single cell status and would receive a RVR for threatening to harm an inmate. Plaintiff was assessed an indeterminate SHU term based on the gang validation.

On January 25, 2009, Plaintiff resubmitted his 602 regarding ASU placement.

On January 28, 2009, Plaintiff received a copy of the RVR for threatening a prospective cell mate.

On January 30, 2009, Plaintiff was interviewed by Correctional Officer Huebner (not a defendant) in relation to the RVR. Plaintiff gave Huebner the name of his former cellmates and a list of questions to ask them.

On January 31, 2009, Defendant Huebner informed Plaintiff that Defendant Gonzalez had denied the questions Plaintiff wanted asked as irrelevant.

On February 2, 2009, Plaintiff submitted a 602 appeal contesting the validation process.

On February 4, 2009, Plaintiff received copies of the RVR for threatening to harm a cellmate.

On February 9, 2009, Plaintiff submitted a 602 on being denied the right to have witnesses interviewed.

Plaintiff eventually was found guilty of threatening to harm an inmate and given a 4 month SHU term.

In January 2010, Plaintiff filed in the California Superior Court a habeas corpus petition challenging his gang validation. His petition and subsequent appeals were denied.

IV.    ANALYSIS

A.    Linkage

Under § 1983, Plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights. Iqbal, 556 U.S. 662, 676-77 (2009); Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton,

588 F.3d 1218, 1235 (9th Cir. 2009); <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002). "A person subjects another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

Liability may not be imposed on supervisory personnel under the theory of respondeat superior, as each defendant is only liable for his or her own misconduct. <u>Iqbal</u>, 556 U.S. at 676-77; <u>Ewing</u>, 588 F.3d at 1235. Supervisors may only be held liable if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989); <u>accord</u> <u>Starr v. Baca</u>, 652 F.3d 1202, 1205-08 (9th Cir. 2011); <u>Corales v. Bennett</u>, 567 F.3d 554, 570 (9th Cir. 2009); <u>Preschooler II v. Clark Cnty. Sch. Bd. of Trs.</u>, 479 F.3d 1175, 1182 (9th Cir. 2007); <u>Harris v. Roderick</u>, 126 F.3d 1189, 1204 (9th Cir. 1997).

Plaintiff alleges that his gang validation violated his First and Fourteenth Amendment rights. Evaluation of a prisoner's due process challenge to gang validation requires determination of the "prison official [who] was the critical decisionmaker." <u>See Castro v. Terhune</u>, 712 F.3d 1304, 1308 (9th Cir. 2013); <u>see also</u> <u>Castro v. Terhune</u>, 237 F. App'x 153, 155 (9th Cir. 2007) (unpublished). Generally, "[i]n the case of administrative segregation founded upon positive gang validation, the official charged with deciding whether to transfer or retain an inmate in administrative segregation is the IGI. Thus, prior to validation as a gang member, [plaintiff is] entitled to an 'informal nonadversary hearing' with an IGI." <u>Stewart v. Alameida</u>, 418 F. Supp. 2d 1154, 1165 (N.D. Cal. 2006) (citing <u>Toussaint v. McCarthy</u>, 926 F.2d 800, 803 (9th Cir. 1990); and <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1276 (N.D. Cal. 1995) ("[I]t is clear that the critical decisionmaker in the process is . . . the IGI.")). Here, that individual is Defendant Turmezi. Indeed, Defendant Turmezi appears to be the only named defendant

1   sufficiently linked to Plaintiff's gang validation to possibly state a claim. Accordingly, he is

2   the only defendant against whom Plaintiff's due process challenge may potentially

3   proceed.

4      As discussed in further detail below, Plaintiff has failed to link any of the named

5   Defendants to his retaliation claim.

6      Plaintiff will be given leave to amend. If he chooses to do so, he must allege

7   sufficient facts to link the named Defendants to his claims.

8   **B.   Due Process**

9      The Due Process Clause protects prisoners from being deprived of liberty without

10   due process of law. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to state a

11   cause of action for deprivation of procedural due process, a plaintiff must first establish

12   the existence of a liberty interest for which the protection is sought. Liberty interests may

13   arise from the Due Process Clause itself or from state law. Hewitt v. Helms, 459 U.S.

14   460, 466 (1983). The Due Process Clause itself does not confer on inmates a liberty

15   interest in being confined in the general prison population instead of segregation. See id.

16   at 466-68. Liberty interests created by state law are limited to freedom from restraint

17   which "imposes atypical and significant hardship on the inmate in relation to the ordinary

18   incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).

19      Assuming that confinement in the SHU for an indeterminate period implicates a

20   liberty interest, Wilkinson v. Austin, 545 U.S. 209, 223–24 (2005) (finding a liberty

21   interest in avoiding indefinite confinement in Ohio's "Supermax" facility), Plaintiff has not

22   demonstrated that he was denied any of the procedural due process protections he is

23   guaranteed under federal law.

24      Assignment to the SHU is an administrative measure rather than a disciplinary

25   measure and is "essentially a matter of administrative discretion." Bruce v. Ylst, 351 F.3d

26   1283, 1287 (9th Cir. 2003) (quoting Munoz v. Rowland, 104 F.3d 1096, 1098 (9th Cir.

27   1997)). To satisfy due process, the administrative segregation process must include an

28

1    informal non-adversary hearing within a reasonable time after being segregated, notice

2    of the charges or the reasons segregation is being considered, and an opportunity for

3    the inmate to present his views. Toussaint v. McCarthy, 801 F.2d 1080, 1100 (9th

4    Cir.1986), overruled on other grounds by Sandin v. Connor, 515 U.S. 472, 481 (1995).

5           The administrative determination also must meet the "some evidence" standard of

6    Superintendent v. Hill, 472 U.S. 445, 455 (1985). Bruce, 351 F.3d at 1287-88. Because

7    the standard for "some evidence" is not high, a court need only decide whether there is

8    any evidence at all that could support the prison officials' administrative decisions. Id. at

9    1287-88. A reviewing court does not "examine the entire record, independently assess

10   witness credibility, or reweigh the evidence." Id. at 1287. However, the evidence

11   supporting the administrative determination must bear "some indicia of reliability." Cato

12   v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987) (citations omitted). California regulations

13   requiring three source items for gang validation do not dictate the outcome of the federal

14   due process analysis. A single piece of evidence that has sufficient indicia of reliability

15   can be sufficient to meet the "some evidence" standard. Bruce, 351 F.3d at 1288.

16          Plaintiff does not argue that he lacked notice of the charges or an opportunity to

17   be heard. Indeed, Plaintiff's complaint and the attached exhibits reflect that he was

18   aware of his potential gang validation and the evidence that would be used against him

19   for some time prior to the validation. He was interviewed and provided written statements

20   regarding the materials used to validate him, and appeared before an ICC to review the

21   validation decision.

22          However, Plaintiff argues that the evidence relied on for validation does not meet

23   the "some evidence" standard. Plaintiff was validated as a gang member based on three

24   independent source items: (1) a confidential memorandum in which an informant

25   identified Plaintiff as "a BGF member actively recruiting other prospects into the prison

26   gang"; (2) Plaintiff's address book containing the names and CDCR numbers of a BGF

27   member and BGF associate; and (3) two photocopied documents allegedly used as BGF

28

1   training materials, entitled "History is a Weapon! Black August Resistance," and "Black

2   August Commemoration: The Revolutionary Class Perspective."

3       At the screening stage, Plaintiff has alleged sufficient facts to call into question the

4   reliability of the confidential informant memorandum. When statements from confidential

5   informants are used to validate inmates as gang members, the record must contain

6   "some factual information from which the committee can reasonably conclude that the

7   information was reliable." Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987).

8   "Reliability may be established by: (1) the oath of the investigating officer appearing

9   before the committee as to the truth of his report that contains confidential information,

10  (2) corroborating testimony, (3) a statement on the record by the chairman of the

11  committee that he had firsthand knowledge of sources of information and considered

12  them reliable based on the informant's past record, or (4) an in camera review of the

13  documentation from which credibility was assessed." Id. at 186-87. Here, the

14  Confidential Information Disclosure Form provided to Plaintiff contains Defendant

15  Turmezi's unsworn statement that the information is reliable because it was

16  (1) independently corroborated by other confidential sources, (2) incriminating to the

17  confidential informant, and (3) corroborated by non-confidential sources. Although

18  information sufficient to establish reliability may have been presented to the Committee,

19  the only evidence apparently in Plaintiff's possession – Defendant Turmezi's unsworn

20  statements – is insufficient.

21      Plaintiff also has alleged sufficient facts to call into question the reliability of the

22  Black August materials. Specifically, he alleges that the materials did not belong to him,

23  and instead belonged to his cell mate. The materials allegedly were co-mingled with

24  Plaintiff's property during a March 4, 2008 search of Plaintiff's cell. Plaintiff

25  unsuccessfully attempted to pursue several 602 appeals regarding the attribution of

26  these materials to him. Accepting these allegations as true, as the Court must do at the

27

28

screening stage, there are sufficient facts to call into question whether the materials constitute "some evidence" that Plaintiff was a BGF associate.

However, Plaintiff has not alleged sufficient facts to call into question whether his address book containing the names and CDCR numbers of a validated BGF member and BGF associate constitutes "some evidence" of his gang affiliation. Plaintiff concedes that his address book contained this information; he argues only that he was not aware of the other inmates' affiliation with the BGF. However, the Court need not, and indeed cannot, assess Plaintiff's credibility or reweigh the evidence. Bruce, 351 F.3d at 1287. Plaintiff's possession of the other inmates' information is "some evidence" of his gang association, even though the information could support competing inferences. See Castro, 712 F.3d at 1315 (signing birthday card to validated gang member sufficient to constitute "some evidence"); Bruce, 351 F.3d at 1288 (probation report noting that inmate's co-defendant was validated as a gang member meets the "some evidence" standard); Hill, 472 U.S. at 457 (evidence may qualify as "some evidence" even if it does not "logically preclude[] any conclusion but the one reached").

Under federal law, only one source item is required to meet the "some evidence" standard and thereby to satisfy due process. Bruce, 351 F.3d at 1288. Because the facts alleged by Plaintiff demonstrate that there was "some evidence" to support his gang validation, his allegations fail to state a claim.

Although it appears unlikely Plaintiff will be able to cure this deficiency, he will be granted leave to amend. If he chooses to do so, he must allege facts to show that the information relied on in his gang validation was not supported by any evidence having an indicia of reliability.

### C.     First Amendment Retaliation

Plaintiff alleges that he was validated as a gang associate in retaliation for filing administrative grievances.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

The second element focuses on causation and motive. See Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009). A plaintiff must show that his protected conduct was a "'substantial' or 'motivating' factor behind the defendant's conduct." Id. (quoting Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989). Although it can be difficult to establish the motive or intent of the defendant, a plaintiff may rely on circumstantial evidence. Bruce, 351 F.3d at 1289 (finding that a prisoner established a triable issue of fact regarding prison officials' retaliatory motives by raising issues of suspect timing, evidence, and statements); Hines v. Gomez, 108 F.3d 265, 267-68 (9th Cir. 1997); Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as circumstantial evidence of retaliatory intent").

In terms of the third prerequisite, filing a grievance is a protected action under the First Amendment. Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

With respect to the fourth prong, "[it] would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . ." Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999). The correct inquiry is to determine whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities. Rhodes, 408 F.3d at 568-69 (citing Mendocino Envtl. Ctr., 192 F.3d at 1300).

With respect to the fifth prong, a prisoner must affirmatively allege that "'the prison authorities' retaliatory action did not advance legitimate goals of the correctional

1   institution or was not tailored narrowly enough to achieve such goals." Rizzo v. Dawson,

2   778 F.2d 527, 532 (9th Cir. 1985).

3       The first grievance discussed in Plaintiff's complaint is his July 29, 2007 appeal

4   involving Defendant Robinson's denial of his law books. However, none of Plaintiff's

5   lengthy allegations indicate that Defendant Robinson participated in any way in Plaintiff's

6   gang validation. Plaintiff has not alleged facts to link Defendant Robinson to any adverse

7   action.[1] Accordingly, Plaintiff has failed to state a retaliation claim against Defendant

8   Robinson. See Iqbal, 556 U.S. at 676-77 (requiring plaintiffs to demonstrate that each

9   defendant personally participated in the deprivation of his rights).

10      Plaintiff also argues that this same grievance gives rise to an inference of suspect

11  timing because his second level appeal was denied on November 21, 2007, the same

12  date of the alleged confidential informant memorandum against him. However, Plaintiff

13  has not alleged which defendants, if any, participated in producing the confidential

14  informant memorandum. Nor has he alleged facts to indicate that any defendants

15  involved with the memorandum were aware of Plaintiff's July 29, 2007 grievance.

16  Accordingly, Plaintiff has stated insufficient facts to allege that the confidential informant

17  memorandum was produced in retaliation for his July 29, 2007 grievance.

18      Additionally, this grievance is temporally distant from the assembly of Plaintiff's

19  gang validation package and his subsequent gang validation, having been submitted

20  more than two years earlier. Plaintiff has failed to state a retaliation claim based on this

21  grievance.

22      Sometime in November or December of 2007 Plaintiff submitted an appeal

23  regarding missing religious oils. The religious oils had been distributed by Defendants

24  Sigston and Robinson. Again, however, Plaintiff has not alleged facts linking Defendants

25  _____

26  [1] To the extent Plaintiff may wish to allege that Defendant Robinson retaliated against him for preparing a
    civil rights complaint by denying his law books, that claim is not properly joined in this action. Fed. R. Civ.
    P. 20(a)(2) ("Persons . . . may be joined in one action as defendants if . . . any right to relief is asserted

27  against them jointly, severally, or in the alternative with respect to or arising out of the same transaction,
    occurrence, or series of transactions or occurrences . . . ."). If Plaintiff wishes to pursue such a claim, he

28  must do so in a separate suit.

Robinson or Sigston to his gang validation. Nor has he alleged that any defendants participating in the validation were aware of this grievance.

Defendant may wish to allege that Defendant Sigston's March 4, 2008 search of Plaintiff's cell was in retaliation for the appeal regarding Plaintiff's religious oils. This cell search allegedly resulted in the co-mingling of Plaintiff's property with his cellmate's property. The cellmate's property allegedly was used in Plaintiff's gang validation. However, the cell search occurred approximately three months after Plaintiff filed his 602. Standing alone, this three month delay is not sufficient to raise an inference of retaliatory intent.

Thereafter, Plaintiff filed appeals on December 17, 2007 (medical appeal), March 10, 2008 (regarding the March 4, 2008 cell search), April 3, 2008 (denial of law library access), June 29, 2009 (confiscation of religious books), August 10, 2008 (missing legal papers), and August 25, 2008 (missing legal papers). He also filed a civil rights complaint concerning unrelated issues on June 23, 2008. Again, however, Plaintiff has failed to allege facts to indicate that any of the Defendants involved in Plaintiff's gang validation were aware of these grievances. Nor has he alleged facts to suggest that his gang validation was motivated by these grievances. Although some of the grievances were submitted shortly before Plaintiff received information regarding his gang validation and was interviewed by Defendant Turmezi, Plaintiff's lengthy history of filing grievances during his entire incarceration at CCI undermines any inference of suspect timing. Lastly, because Plaintiff's gang validation is supported by some evidence, Plaintiff has not alleged that the validation was unrelated to any legitimate penological goal.

Plaintiff argues that Defendants must be held liable for the allegedly retaliatory gang validation because he repeatedly claimed that the validation was retaliatory and that the materials seized from his cell were not his. This is not sufficient to state a claim. As stated above, Plaintiff must allege facts to show that the named Defendants took adverse action against him because of his protected conduct, that the action would chill

a person of ordinary firmness, and that the action did not reasonably advance a legitimate correctional goal. <u>Rhodes</u>, 408 F.3d at 567-68. His assertion that he told Defendants that the validation was retaliatory does not establish that it was retaliatory.

Plaintiff will be given leave to amend. If he chooses to do so, he must allege facts to show the elements of a retaliation claim discussed above.

### E.     Declaratory Relief

In addition to damages and injunctive relief, Plaintiff seeks declaratory relief. However, because his claims for damages necessarily entail a determination whether his rights were violated, his separate request for declaratory relief is subsumed by those claims. <u>Rhodes v. Robinson</u>, 408 F.3d 559, 566 n.8 (9th Cir. 2005). Accordingly, his claim for declaratory relief should be dismissed.

### E.     Official Capacity

Plaintiff names each defendant in their individual and official capacities.

"Official capacity" suits require that a policy or custom of the governmental entity is the moving force behind the violation. <u>McRorie v. Shimoda</u>, 795 F.2d 780, 783 (9th Cir. 1986). Plaintiff has not alleged that any custom or policy motivated Defendants' conduct. Accordingly, Plaintiff's official capacity claims will be dismissed.

If Plaintiff chooses to amend, he must allege facts to demonstrate that a policy or custom was the moving force behind the violation. Plaintiff further is advised that he cannot recover money damages from state officials in their official capacities. <u>Aholelei v. Dept. of Public Safety</u>, 488 F.3d 1144, 1147 (9th Cir. 2007) (citations omitted). Official capacity suits may seek only prospective relief. <u>See</u> <u>Wolfson v. Brammer</u>, 616 F.3d 1045, 1065-66 (9th Cir. 2010).

### VII.   CONCLUSION AND ORDER

Plaintiff's complaint does not state a claim. The Court will grant Plaintiff an opportunity to file an amended complaint. <u>Noll v. Carlson</u>, 809 F.2d 1446, 1448-49 (9th Cir. 1987). If Plaintiff opts to amend, he must demonstrate that the alleged acts resulted

1   in a deprivation of his constitutional rights. Iqbal, 556 U.S. at 677-78. Plaintiff must set

2   forth "sufficient factual matter . . . to 'state a claim that is plausible on its face.'" Id. at 678

3   (quoting Twombly, 550 U.S. at 555 (2007)). Plaintiff must also demonstrate that each

4   named Defendant personally participated in a deprivation of his rights. Jones v. Williams,

5   297 F.3d 930, 934 (9th Cir. 2002).

6          Plaintiff should note that although he has been given the opportunity to amend, it

7   is not for the purposes of adding new claims. George v. Smith, 507 F.3d 605, 607 (7th

8   Cir. 2007). Plaintiff should carefully read this screening order and focus his efforts on

9   curing the deficiencies set forth above.

10         Finally, Plaintiff is advised that Local Rule 220 requires that an amended

11  complaint be complete in itself without reference to any prior pleading. As a general rule,

12  an amended complaint supersedes the original complaint. See Loux v. Rhay, 375 F.2d

13  55, 57 (9th Cir. 1967). Once an amended complaint is filed, the original complaint no

14  longer serves any function in the case. Therefore, in an amended complaint, as in an

15  original complaint, each claim and the involvement of each defendant must be

16  sufficiently alleged. The amended complaint should be clearly and boldly titled "First

17  Amended Complaint," refer to the appropriate case number, and be an original signed

18  under penalty of perjury. Plaintiff's amended complaint should be brief. Fed. R. Civ. P.

19  8(a). Although accepted as true, the "[f]actual allegations must be [sufficient] to raise a

20  right to relief above the speculative level . . . ." Twombly, 550 U.S. at 555 (citations

21  omitted).

22         Accordingly, it is HEREBY ORDERED that:

23         1.  The Clerk's Office shall send Plaintiff (1) a blank civil rights complaint form and

24             (2) a copy of his Complaint, filed October 14, 2011;

25         2.  Plaintiff's Complaint is dismissed for failure to state a claim upon which relief

26             may be granted;

27         3.  Plaintiff shall file an amended complaint within thirty (30) days; and

28

4.  If Plaintiff fails to file an amended complaint in compliance with this order, this action will be dismissed, with prejudice, for failure to state a claim and failure to comply with a court order subject to the "three strikes" provision set forth in 28 U.S.C. § 1915(g). Silva v. Di Vittorio, 658 F.3d 1090, 1098 (9th Cir. 2011).

IT IS SO ORDERED.

Dated:   March 27, 2015        /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE

21