1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

VALENTINE E. UNDERWOOD,

                    Plaintiff,

        v.

F. GONZALEZ, et al.,

                    Defendants.

CASE NO. 1:11-cv-1710-LJO-MJS (PC)

**FINDINGS AND RECOMMENDATION TO DISMISS ACTION WITH PREJUDICE FOR FAILURE TO STATE A CLAIM**

**(ECF NO. 20)**

**FOURTEEN (14) DAY OBJECTION DEADLINE**

Plaintiff is a state prisoner proceeding pro se in this civil rights action brought pursuant to 42 U.S.C. § 1983. (ECF No. 1.)

On March 30, 2015, the Court dismissed Plaintiff's complaint for failure to state a claim, but gave leave to amend. (ECF No. 19.) His first amended complaint is before the Court for screening.

**I.      SCREENING REQUIREMENT**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous, malicious," or that fail to state a claim upon which

1  relief may be granted, or that seek monetary relief from a defendant who is immune from
2  such relief. 28 U.S.C. § 1915A(b)(1), (2).

3  **II.    PLEADING STANDARD**

4      Section 1983 "provides a cause of action for the deprivation of any rights,
5  privileges, or immunities secured by the Constitution and laws of the United States."
6  Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983).
7  Section 1983 is not itself a source of substantive rights, but merely provides a method for
8  vindicating federal rights conferred elsewhere. Graham v. Connor, 490 U.S. 386, 393-94
9  (1989).

10     To state a claim under § 1983, a plaintiff must allege two essential elements:
11  (1) that a right secured by the Constitution or laws of the United States was violated and
12  (2) that the alleged violation was committed by a person acting under the color of state
13  law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Ketchum v. Alameda Cnty., 811 F.2d
14  1243, 1245 (9th Cir. 1987).

15     A complaint must contain "a short and plain statement of the claim showing that
16  the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations
17  are not required, but "[t]hreadbare recitals of the elements of a cause of action,
18  supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S.
19  662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).
20  Plaintiff must set forth "sufficient factual matter, accepted as true, to state a claim to relief
21  that is plausible on its face." Id. Facial plausibility demands more than the mere
22  possibility that a defendant committed misconduct and, while factual allegations are
23  accepted as true, legal conclusions are not. Id. at 677-78.

24  **III.   PLAINTIFF'S ALLEGATIONS**

25     Plaintiff's allegations are essentially unchanged from those contained in his initial
26  complaint.

27

28

Plaintiff is incarcerated at Salinas Valley State Prison, but complains of acts that occurred at California Correctional Institution ("CCI"). He names the following Defendants in their individual capacities: (1) Warden F. Gonzalez, (2) Associate Warden M. Carrasco, (3) Investigative Services Unit Captain J. Gutierrez, (4) I.G.I. Lieutenant J. Gentry, (5) I.G.I. Sergeant L. Machado, (6) I.G.I. Correctional Officer Sigston, and (7) I.G.I. Correctional Officer T. Turmezi.

Plaintiff was validated as a member of the Black Guerilla Family ("BGF") gang on December 16, 2008. He alleges the validation was in retaliation for the exercise of his First Amendment rights and also violated his Fourteenth Amendment Due Process rights. He further alleged that his law books and religious books were denied in retaliation, and in violation of his Due Process rights.

He seeks the removal of harmful documents pertaining to validation from his central file, money damages, and all necessary changes to correct the violations of his rights.

Plaintiff provides a lengthy list of facts, occurring over more than a two year period, that he believes support his claims. He also provides approximately 200 pages of exhibits in support of his complaint. Although the relevance of some of these facts and exhibits is difficult to ascertain, Plaintiff's allegations are nonetheless detailed below.

On November 21, 2006, Plaintiff was involved in an altercation with correctional officers at Kern Valley State Prison. He was assessed a Security Housing Unit ("SHU") term and transferred to the SHU at CCI.

In March and May 2007, Plaintiff appeared before an Institutional Classification Committee ("ICC") chaired by Defendant Gonzalez. On both occasions, Counselor Torres (not a defendant) noted that Plaintiff's SHU term was short, and discussed placing Plaintiff in the Behavior Modified Unit ("BMU"). On both occasions, Defendant Gonzalez stated Plaintiff's SHU term was correct and that Plaintiff was not "BMU qualified." During the May 2007 ICC, Gonzalez asked Plaintiff if he would like to stay on

the CCI general population yard at the conclusion of his SHU term because Plaintiff's wife lived nearby. Plaintiff agreed.

On May 21, 2007 Plaintiff's SHU term concluded. Plaintiff received notice he was being placed in the Administrative Segregation Unit ("ASU") pending available bed space in the general population yard.

On June 5, 2007, Plaintiff appeared before an unscheduled ICC chaired by Defendant Carrasco.

On June 20, 2007, Plaintiff wrote Defendant Gonzalez regarding his ASU housing and asked that he be moved to general population and issued his property.

On June 28, 2007, Defendant Carrasco responded, stating that there was no available bed space in the general population.

On July 5, 2007, Plaintiff was moved to the general population and issued his property.

On July 6, 2007, Plaintiff appeared before a Unit Classification Committee ("UCC"), where he was handcuffed, taken to the BMU, and denied all property.

On July 10, 2007, Plaintiff wrote Defendant Gonzalez asking to be removed from the BMU. He reminded Gonzalez that he previously determined Plaintiff was not BMU qualified.

On July 11, 2007, Plaintiff submitted an administrative appeal contesting his BMU placement. His appeal was returned to him and was not processed.

On July 17, 2007, Plaintiff received a response from Defendant Carrasco regarding his July 10, 2007 letter. Carrasco stated that Plaintiff's request to be removed from BMU was denied based on Plaintiff being found guilty of a Rules Violation Report (RVR) for the November 21, 2006 altercation with a correctional officer. Although Plaintiff contested the RVR, it was not overturned.

On July 27, 2007, Plaintiff was escorted to "R&R" to receive his BMU-allowable property. Defendant Robinson denied Plaintiff his law books. Robinson also slammed

1   down a draft of Plaintiff's civil rights complaint concerning excessive force at KVSP.
2   Three other correctional officers were present.

3       On July 29, 2007, Plaintiff submitted a 602 appeal regarding the denial of his law
4   books.

5       On October 6, 2007, Plaintiff was released from BMU to the general population.

6       On November 21, 2007, Plaintiff received the second level response denying his
7   602 regarding his law books. Also on November 21, 2007, a confidential memorandum
8   was produced that eventually was relied on in Plaintiff's gang validation.

9       In November or December of 2007, Plaintiff went to R&R to pick up an order of
10   Islamic oils. Defendants Sigston and Robinson were present. Defendant Sigston issued
11   Plaintiff's supplies. Plaintiff was missing one of his oils. When he asked about the oil he
12   was told, "You got what your getting." Plaintiff submitted a 602 appeal but received no
13   response. Thereafter, Defendant Sigston became an Institutional Gang Investigator.

14       On March 4, 2008, Defendant Sigston searched Plaintiff's cell and took his
15   property.

16       On March 10, 2008, Plaintiff's property was returned and was comingled with his
17   cellmate's property. Plaintiff's property had a notice stating, "Gang training materials
18   confiscated."  Some of Plaintiff's legal paperwork had been highlighted in yellow marker.

19       On or about March 10, 2008, Plaintiff submitted a 602 administrative appeal
20   regarding his property.

21       On April 5, 2008, Plaintiff's institution was placed on lockdown.

22       On April 30, 2008, Plaintiff's cell was searched and his religious books were
23   confiscated. His excessive force civil rights complaint was spread out on his bed.

24       On June 23, 2008, Plaintiff filed his excessive force civil rights complaint,
25   Underwood v. Knowles, Case No. 1:08-cv-00986.

26       On June 24, 2008, Plaintiff wrote the Prison Law Office requesting assistance in
27   getting medical care.

28

On June 25, 2008, Plaintiff wrote the Department of Justice requesting assistance in getting medical care.

On June 29, 2009, Plaintiff submitted a 602 appeal regarding his religious books being confiscated and then lost. Plaintiff contends that this appeal was granted at the First Level, but then denied by Defendant Carrasco on improper and falsified grounds at the second level.[1]

On July 28, 2008, Plaintiff received a response from the Prison Law Office.

On August 7, 2008, Plaintiff's cell was searched, his legal papers were taken, and a list of Defendants in his excessive force case was taken from his cell.

On or about August 10, 2008, Plaintiff submitted a 602 appeal regarding his missing legal papers. The appeal was returned for Plaintiff to seek an informal response.

On August 13, 2008, Plaintiff sent a copy of one of his medical 602s to the Prison Law Office.

On August 25, 2008, Plaintiff resubmitted his 602 regarding missing legal papers. Plaintiff complained to Correctional Officer Erwin (not a defendant), and was told, "Leave it alone, your already on thin ice."

On or about August 25, 2008, Defendant Machado interviewed Plaintiff regarding his March 10, 2008 appeal regarding the alleged confiscation of gang material and comingling of Plaintiff's and his cell mate's property. Machado informed Plaintiff that the gang material was a picture of a man in chains in front of a map of Africa. Defendant Machado told Plaintiff he would respond to the appeal within a week, but never

---

[1] These contentions are somewhat contradicted by Plaintiff's exhibits. The exhibits reflect that Plaintiff submitted a CDCR Form 22 to Defendant Foster, alleging that Defendant Foster agreed to settle Plaintiff's grievance by getting him hygiene supplies, but that no such supplies were provided. Defendant Foster responded by stating that he had not agreed to anything, but would see what he could do. (ECF No. 20 at 196.) Plaintiff's appeal of this issue was granted at the first level, to the extent Plaintiff was offered a replacement Qu'ran and dictionary. (ECF No. 20 at 121.) Plaintiff found the replacement items to be unsatisfactory and appealed to the second level, requesting hygiene items instead. (ECF No. 20 at 123.) The second level appeal was denied on the ground Plaintiff had accepted the replacement books. (ECF No. 20 at 126.) The appeal also was denied at the Director's Level. There, the reviewer noted that Plaintiff apparently had refused the replacement books, but could nevertheless renew his request for such replacements. Other compensation was denied. (ECF No. 20 at 119.)

6

1 responded. Plaintiff made several attempts to contact Defendants Machado, Gentry and
2 Gutierrez to obtain a response, but was unsuccessful.   Plaintiff resubmitted the
3 grievance several times, but it was denied.

4 Also on August 25, 2008, Plaintiff received a response from the Prison Law Office
5 regarding his medical issues.

6 On August 28, 2008, Defendant Foster discussed with Plaintiff compensation for
7 the religious books that had been confiscated during a cell search. Foster stated that he
8 would get items to compensate Plaintiff and would be right back. Foster later told Plaintiff
9 he was told by a Lieutenant not to compensate Plaintiff.[2]

10 Later that day, Correctional Officer Hutton (not a defendant) told Plaintiff the
11 lieutenant wanted to speak to him. Plaintiff was handcuffed, escorted outside, and told
12 by Defendants Turmezi and Sigston that he was being placed in ASU. They stated, "We
13 got what we want today Underwood, you'll get what you want tomorrow."

14 On August 29, 2008, Plaintiff was transferred to Bakersfield for a biopsy. This was
15 the care Plaintiff had requested in his letters to the Prison Law Office and Department of
16 Justice.

17 On September 1, 2008 Plaintiff wrote the Prison Law Office requesting
18 information regarding retaliation and the gang validation process.

19 On September 2, 2008, Plaintiff was given three source items being used against
20 him in the gang validation process, three confidential memoranda, and a CDCR 128B
21 chrono.

22 On September 3, 2008, Plaintiff received a Prison Focus Magazine titled "Black
23 August We Will Never Forget," in the mail.

24 On September 4, 2008, Plaintiff appeared before an ICC chaired by Defendant
25 Carrasco. Plaintiff complained of retaliation. He requested a response from Defendant
26 Machado to his 602 regarding the alleged gang materials. Plaintiff asked Carrasco to

27

28 [2] See n.1, supra.

7

1  instruct Plaintiff to forward a response to his appeal. Defendant Carrasco stated, "she
2  has more important things to do."

3     Also on September 4, 2008, Plaintiff was interviewed by Defendant Turmezi.
4  Plaintiff explained that he had never been a member or associate of a gang. Turmezi
5  showed Plaintiff a green sheet of Black August material allegedly found in Plaintiff's
6  property. Plaintiff explained his Black August material was on white paper. Turmezi
7  would not allow Plaintiff to see the material, stating it was confidential. Turmezi stated
8  that all Black August material is BGF material. Plaintiff mentioned the magazine titled,
9  "Black August We Will Never Forget" being given to inmates in the mail. Turmezi and
10  five or six other officers started laughing.

11     Also on September 4, 2008, Plaintiff wrote Defendant Gonzalez about not being
12  issued his legal property.

13     On September 6, 2008, Plaintiff wrote Prison Focus Magazine regarding the use
14  of Black August material to validate Plaintiff as a BGF member.

15     On September 8, 2008, Plaintiff re-submitted an appeal regarding the confiscation
16  of alleged gang material and comingling of his property with his cell mate's property. The
17  appeal was not processed.

18     On September 8, 2008, Plaintiff submitted a 602 regarding his ASU placement.

19     On September 10, 2008, Plaintiff received a response from Defendant Carrasco
20  to his September 4, 2008 letter. Carrasco stated Plaintiff received his property on
21  September 9, 2008.

22     Plaintiff received his property on September 11, 2008.

23     On September 12, 2008, Plaintiff received a letter from the Prison Law Office
24  notifying him that they wrote the Attorney General regarding Plaintiff's medical needs.

25     On September 15, 2008, Plaintiff submitted a 602 appeal requesting a polygraph
26  regarding his alleged gang affiliation. His appeal was not processed.

27

28

On September 20, 2008, Plaintiff appeared before an ICC. He argued that the gang validation process was retaliatory. Defendant Carrasco refused to assist Plaintiff in getting a response to his 602 regarding the confiscation of alleged gang material from his cell and comingling of his property with his cell mate's property.

On October 6, 2008, Plaintiff received a letter from the Prison Law Office regarding his medical care.

On October 9, 2008, Plaintiff received a response from Prison Focus Magazine.

On October 15, 2008, Plaintiff resubmitted a 602 appeal regarding his property being co-mingled with his cell mate's when the alleged gang material was found. His appeal was denied processing.

On October 27, 2008, Plaintiff received a response to his 602 requesting a polygraph.

On October 29, 2008, Plaintiff was taken for an MRI and spoke with Defendant Foster during transport. He asked why his inmate request slip stated, "Lieutenant said no to compensating me," yet the appeal log stated Plaintiff was compensated. Foster stated, "Oh well."  Plaintiff stated, "I'll address this with the Courts." Foster responded, "that's your problem now Underwood, ever since you got that typewriter, you've been suing everyone. That's why your where you are now."

On November 2, 2008, Plaintiff wrote Defendant Gutierrez and requested an interview to explain the importance of having Defendant Machado respond to his 602 regarding the search of his property and requesting that Defendant Machado be instructed to forward a response. Defendant Guiterrez responded that Defendant Machado was no longer assigned as an IGI and, in any event, denied receiving Plaintiff's 602. Defendant Gutierrez advised Plaintiff to forward the 602 to his office so it could be assigned to appropriate staff. Plaintiff did so, but received no response. He then submitted a "citizen's complaint" on this issue, but it was denied processing.

On November 3, 2008, Plaintiff forwarded his 602 request for a polygraph to the Appeal Branch.

On November 17, 2008, Plaintiff submitted a request to Defendant Gentry to instruct Defendant Machado to respond to Plaintiff's 602.

Also on November 17, 2008, Plaintiff received a response from the appeals coordinator regarding his request for a polygraph.

On November 20, 2008, Plaintiff received a response from Defendant Gentry informing him that Defendant Machado was no longer assigned as an IGI.

On December 16, 2008, the Office of Correctional Safety validated Plaintiff as an associate of the BGF with an active/inactive review eligibility date of March 14, 2014. Plaintiff received notice of the validation on December 29, 2008.

On January 5, 2009, Plaintiff resubmitted his citizen's complaint against Defendant Machado to the appeals coordinator.

On January 22, 2009, Plaintiff appeared before an ICC chaired by Defendant Carrasco. Plaintiff asked about his claims of retaliation and Carrasco stated, "When are you going to realize you have nothing coming before me." She informed Plaintiff that he had been validated and asked if he wanted to debrief. Plaintiff stated he could not debrief because he was not a gang member or associate. Carrasco stated that Plaintiff would be housed with other validated gang members. Plaintiff refused to be celled with a gang member. Carrasco stated that he would be getting a cellmate. Plaintiff stated that doing so would lead to "a situation." Carrasco again stated he would have a cell mate. Plaintiff stated there would be a "crime scene" in the cell. Carrasco then stated Plaintiff would be placed in a single cell and would receive a RVR for threatening to harm an inmate. Plaintiff was assessed an indeterminate SHU term based on the gang validation.

On January 25, 2009, Plaintiff resubmitted his 602 regarding ASU placement.

On January 28, 2009, Plaintiff received a copy of the RVR for threatening a prospective cell mate.

10

On January 30, 2009, Plaintiff was interviewed by Correctional Officer Huebner (not a defendant) in relation to the RVR. Plaintiff gave Huebner the name of his former cellmates and a list of questions to ask them.

On January 31, 2009, Defendant Huebner informed Plaintiff that Defendant Gonzalez had denied the questions Plaintiff wanted asked ask irrelevant.

On February 2, 2009, Plaintiff submitted a 602 appeal contesting the validation process.

On February 4, 2009, Plaintiff received copies of the RVR for threatening to harm a cellmate.

On February 9, 2009, Plaintiff submitted a 602 on being denied the right to have witnesses interviewed.

Plaintiff eventually was found guilty of threatening to harm an inmate and given a 4 month SHU term.

In January 2010, Plaintiff filed in the California Superior Court a habeas corpus petition challenging his gang validation. His petition and subsequent appeals were denied.

**IV.     ANALYSIS**

**A.     Linkage**

Under § 1983, Plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights. Iqbal, 556 U.S. 662, 676-77 (2009); Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). "A person subjects another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

1         Liability may not be imposed on supervisory personnel under the theory of

2   respondeat superior, as each defendant is only liable for his or her own misconduct.

3   Iqbal, 556 U.S. at 676-77; Ewing, 588 F.3d at 1235. Supervisors may only be held liable

4   if they "participated in or directed the violations, or knew of the violations and failed to act

5   to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); accord Starr v.

6   Baca, 652 F.3d 1202, 1205-08 (9th Cir. 2011); Corales v. Bennett, 567 F.3d 554, 570

7   (9th Cir. 2009); Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1182 (9th

8   Cir. 2007); Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997).

9         Plaintiff alleges that his gang validation violated his First and Fourteenth

10   Amendment rights. Evaluation of a prisoner's due process challenge to gang validation

11   requires determination of the "prison official [who] was the critical decisionmaker." See

12   Castro v. Terhune, 712 F.3d 1304, 1308 (9th Cir. 2013); see also Castro v. Terhune, 237

13   F. App'x 153, 155 (9th Cir. 2007) (unpublished). Generally, "[i]n the case of

14   administrative segregation founded upon positive gang validation, the official charged

15   with deciding whether to transfer or retain an inmate in administrative segregation is the

16   IGI. Thus, prior to validation as a gang member, [plaintiff is] entitled to an 'informal

17   nonadversary hearing' with an IGI." Stewart v. Alameida, 418 F. Supp. 2d 1154, 1165

18   (N.D. Cal. 2006) (citing Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990); and

19   Madrid v. Gomez, 889 F. Supp. 1146, 1276 (N.D. Cal. 1995) ("[I]t is clear that the critical

20   decisionmaker in the process is . . . the IGI.")). Here, that individual is Defendant

21   Turmezi. Indeed, Defendant Turmezi appears to be the only named defendant

22   sufficiently linked to Plaintiff's gang validation to possibly state a claim. Accordingly, he is

23   the only defendant against whom Plaintiff's due process challenge may potentially

24   proceed.

25         As discussed in further detail below, Plaintiff has failed to link any of the named

26   Defendants to his retaliation claim.

27

28

1  Plaintiff was given leave to amend for the purpose of curing this deficiency and

2  failed to do so. Further leave to amend would be futile and should be denied.

3      **B.    Due Process**

4      The Due Process Clause protects prisoners from being deprived of liberty without

5  due process of law. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to state a

6  cause of action for deprivation of procedural due process, a plaintiff must first establish

7  the existence of a liberty interest for which the protection is sought. Liberty interests may

8  arise from the Due Process Clause itself or from state law. Hewitt v. Helms, 459 U.S.

9  460, 466 (1983). The Due Process Clause itself does not confer on inmates a liberty

10 interest in being confined in the general prison population instead of segregation. See id.

11 at 466-68. Liberty interests created by state law are limited to freedom from restraint

12 which "imposes atypical and significant hardship on the inmate in relation to the ordinary

13 incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).

14     Assuming that confinement in the SHU for an indeterminate period implicates a

15 liberty interest, Wilkinson v. Austin, 545 U.S. 209, 223–24 (2005) (finding a liberty

16 interest in avoiding indefinite confinement in Ohio's "Supermax" facility), Plaintiff has not

17 demonstrated that he was denied any of the procedural due process protections he is

18 guaranteed under federal law. Assignment to the SHU is an administrative measure

19 rather than a disciplinary measure and is "essentially a matter of administrative

20 discretion." Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003) (quoting Munoz v.

21 Rowland, 104 F.3d 1096, 1098 (9th Cir. 1997)). To satisfy due process, the

22 administrative segregation process must include an informal non-adversary hearing

23 within a reasonable time after being segregated, notice of the charges or the reasons

24 segregation is being considered, and an opportunity for the inmate to present his views.

25 Toussaint v. McCarthy, 801 F.2d 1080, 1100 (9th Cir.1986), overruled on other grounds

26 by Sandin v. Connor, 515 U.S. 472, 481 (1995).

27

28

13

1       The administrative determination also must meet the "some evidence" standard of

2   Superintendent v. Hill, 472 U.S. 445, 455 (1985). Bruce, 351 F.3d at 1287-88. Because

3   the standard for "some evidence" is not high, a court need only decide whether there is

4   any evidence at all that could support the prison officials' administrative decisions. Id. at

5   1287-88. A reviewing court does not "examine the entire record, independently assess

6   witness credibility, or reweigh the evidence." Id. at 1287. However, the evidence

7   supporting the administrative determination must bear "some indicia of reliability." Cato

8   v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987) (citations omitted). California regulations

9   requiring three source items for gang validation do not dictate the outcome of the federal

10  due process analysis. A single piece of evidence that has sufficient indicia of reliability

11  can be sufficient to meet the "some evidence" standard. Bruce, 351 F.3d at 1288.

12      Plaintiff does not argue that he lacked notice of the charges or an opportunity to

13  be heard. Indeed, Plaintiff's complaint and the attached exhibits reflect that he was

14  aware of his potential gang validation and the evidence that would be used against him

15  for some time prior to the validation. He was interviewed and provided written statements

16  regarding the materials used to validate him, and appeared before an ICC to review the

17  validation decision.

18      However, Plaintiff argues that the evidence relied on for validation does not meet

19  the "some evidence" standard. Plaintiff was validated as a gang member based on three

20  independent source items: (1) a confidential memorandum in which an informant

21  identified Plaintiff as "a BGF member actively recruiting other prospects into the prison

22  gang"; (2) Plaintiff's address book containing the names and CDCR numbers of a BGF

23  member and BGF associate; and (3) two photocopied documents allegedly used as BGF

24  training materials, entitled "History is a Weapon! Black August Resistance," and "Black

25  August Commemoration: The Revolutionary Class Perspective."

26      As stated in the Court's prior screening order, Plaintiff has alleged sufficient facts

27  to call into question the reliability of the confidential informant memorandum for the

28

purposes of his screening his complaint. When statements from confidential informants are used to validate inmates as gang members, the record must contain "some factual information from which the committee can reasonably conclude that the information was reliable." <u>Zimmerlee v. Keeney</u>, 831 F.2d 183, 186 (9th Cir. 1987). "Reliability may be established by: (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) an in camera review of the documentation from which credibility was assessed." <u>Id.</u> at 186-87. Here, the Confidential Information Disclosure Form provided to Plaintiff contains Defendant Turmezi's unsworn statement that the information is reliable because it was (1) independently corroborated by other confidential sources, (2) incriminating to the confidential informant, and (3) corroborated by non-confidential sources. Although information sufficient to establish reliability may have been presented to the Committee, the only evidence apparently in Plaintiff's possession – Defendant Turmezi's unsworn statements – is insufficient.

However, Plaintiff has not alleged sufficient facts to call into question the reliability of the Black August materials. He alleges only that the materials did not belong to him. Although his complaint contains numerous allegations that his property was comingled with his cell mate's (and the Court previously found these allegation sufficient to undermine the reliability of these materials), he now states that the Black August materials <u>were not</u> his cell mate's, but instead belonged to someone else or were fabricated entirely. Alternatively, he argues that he does not remember possessing the items and was not aware the materials were gang related. Generalized speculation that the items were fabricated or misattributed to Plaintiff is insufficient to state a claim. <u>Twombly</u>, 550 U.S. at 555 (factual allegations must be sufficient to raise a right to relief above the speculative level). Additionally, the Court will not assess Plaintiff's credibility or

1  reweigh the evidence to determine whether the items properly reflect on Plaintiff's gang

2  association. Bruce, 351 F.3d at 1287. The court is satisfied that the materials constitute

3  "some evidence" having sufficient indicia of reliability to support the validation under the

4  applicable standards. Plaintiff's challenges to this source item fail to state a claim.

5      Plaintiff also has not alleged sufficient facts to call into question whether his

6  address book containing the names and CDCR numbers of a validated BGF member

7  and BGF associate constitutes "some evidence" of his gang affiliation. Plaintiff concedes

8  that his address book contained this information; he argues only that he was not aware

9  of the other inmates' affiliation with the BGF. However, the Court need not, and indeed

10  cannot, assess Plaintiff's credibility or reweigh the evidence. Bruce, 351 F.3d at 1287.

11  Plaintiff's possession of the other inmates' information is "some evidence" of his gang

12  association, even though the information could support competing inferences. See

13  Castro, 712 F.3d at 1315 (signing birthday card to validated gang member sufficient to

14  constitute "some evidence"); Bruce, 351 F.3d at 1288 (probation report noting that

15  inmate's co-defendant was validated as a gang member meets the "some evidence"

16  standard); Hill, 472 U.S. at 457 (evidence may qualify as "some evidence" even if it does

17  not "logically preclude[] any conclusion but the one reached").

18      Under federal law, only one source item is required to meet the "some

19  evidence" standard and thereby to satisfy due process. Bruce, 351 F.3d at 1288.

20  Because the facts alleged by Plaintiff demonstrate that there was "some evidence" to

21  support his gang validation, his allegations fail to state a claim.

22      Plaintiff previously was advised of these deficiencies and failed to cure them.

23  Indeed, his first amended complaint contains nearly identical allegations, and nearly

24  identical deficiencies, as his original complaint. Accordingly, further leave to amend

25  would be futile and should be denied.

26

27

28

16

### C.    First Amendment Retaliation

Plaintiff alleges that his placement in BMU and his gang validation were in retaliation for exercising his constitutional rights.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

The second element focuses on causation and motive. See Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009). A plaintiff must show that his protected conduct was a "'substantial' or 'motivating' factor behind the defendant's conduct." Id. (quoting Sorrano's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989). Although it can be difficult to establish the motive or intent of the defendant, a plaintiff may rely on circumstantial evidence. Bruce, 351 F.3d at 1289 (finding that a prisoner established a triable issue of fact regarding prison officials' retaliatory motives by raising issues of suspect timing, evidence, and statements); Hines v. Gomez, 108 F.3d 265, 267-68 (9th Cir. 1997); Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as circumstantial evidence of retaliatory intent").

In terms of the third prerequisite, filing a grievance is a protected action under the First Amendment. Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

With respect to the fourth prong, "[it] would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . ." Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999). The correct inquiry is to determine whether an official's acts would chill or silence a person of ordinary firmness from future First

1  Amendment activities. Rhodes, 408 F.3d at 568-69 (citing Mendocino Envtl. Ctr., 192
2  F.3d at 1300).

3      With respect to the fifth prong, a prisoner must affirmatively allege that "'the prison
4  authorities' retaliatory action did not advance legitimate goals of the correctional
5  institution or was not tailored narrowly enough to achieve such goals." Rizzo v. Dawson,
6  778 F.2d 527, 532 (9th Cir. 1985).

7      Plaintiff alleges he was placed in the BMU on July 6, 2007. His allegation that the
8  placement was retaliatory appears to be predicated entirely on his view that the
9  placement was unjustified. He does not allege he engaged in any protected conduct
10 prior to his BMU placement. Accordingly, he has failed to show that any protected
11 conduct was a substantial or motivating factor behind his BMU placement. This
12 allegation therefore fails to state a claim.

13     Plaintiff next argues that his gang validation was retaliatory. The first protected
14 conduct discussed in Plaintiff's complaint is his July 29, 2007 appeal involving Defendant
15 Robinson's denial of his law books. However, none of Plaintiff's lengthy allegations
16 indicate that Defendant Robinson participated in any way in Plaintiff's gang validation.
17 Plaintiff has not alleged facts to link Defendant Robinson to any adverse action.[3]
18 Accordingly, Plaintiff has failed to state a retaliation claim against Defendant Robinson.
19 See Iqbal, 556 U.S. at 676-77 (requiring plaintiffs to demonstrate that each defendant
20 personally participated in the deprivation of his rights).

21     Plaintiff also argues that this same grievance gives rise to an inference of suspect
22 timing because his second level appeal was denied on November 21, 2007, the same
23 date of the alleged confidential informant memorandum against him. However, Plaintiff

24 _____

25 [3] To the extent Plaintiff may wish to allege that Defendant Robinson denied his due process rights and
   retaliated against him for preparing a civil rights complaint by denying his law books, that claim is not
   properly joined in this action. Fed. R. Civ. P. 20(a)(2) ("Persons . . . may be joined in one action as
26 defendants if . . . any right to relief is asserted against them jointly, severally, or in the alternative with
   respect to or arising out of the same transaction, occurrence, or series of transactions or
27 occurrences . . . ."). If Plaintiff wishes to pursue such a claim, he must do so in a separate suit. The same
   holds true for Plaintiff's claim that his religious books were confiscated by unidentified individuals in
28 retaliation for preparing a civil rights complaint and in violation of his due process rights.

has not alleged which defendants, if any, participated in producing the confidential informant memorandum. Nor has he alleged facts to indicate that any defendants involved with the memorandum were aware of Plaintiff's July 29, 2007 grievance. Accordingly, Plaintiff has stated insufficient facts to allege that the confidential informant memorandum was produced in retaliation for his July 29, 2007 grievance.

Additionally, this grievance is temporally distant from the assembly of Plaintiff's gang validation package and his subsequent gang validation, having been submitted more than two years earlier. Plaintiff has failed to state a retaliation claim based on this grievance.

Sometime in November or December of 2007 Plaintiff submitted an appeal regarding missing religious oils. The religious oils had been distributed by Defendants Sigston and Robinson. Again, however, Plaintiff has not alleged facts linking Defendants Robinson or Sigston to his gang validation. Nor has he alleged that any defendants participating in the validation were aware of this grievance.

Defendant may wish to allege that Defendant Sigston's March 4, 2008 search of Plaintiff's cell was in retaliation for the appeal regarding Plaintiff's religious oils. This cell search allegedly resulted in the co-mingling of Plaintiff's property with his cellmate's property. The cellmate's property allegedly was used in Plaintiff's gang validation. However, the cell search occurred approximately three months after Plaintiff filed his 602. Standing alone, this three month delay is not sufficient to raise an inference of retaliatory intent.

Thereafter, Plaintiff filed appeals on December 17, 2007 (medical appeal), March 10, 2008 (regarding the March 4, 2008 cell search), April 3, 2008 (denial of law library access), June 29, 2009 (confiscation of religious books), August 10, 2008 (missing legal papers), and August 25, 2008 (missing legal papers). He also filed a civil rights complaint concerning unrelated issues on June 23, 2008 (and suggests that Defendant Robinson and other unnamed correctional officers were aware of the draft complaint as

1  early as July 27, 2007). Again, however, Plaintiff has failed to allege facts to indicate that

2  any of the Defendants involved in Plaintiff's gang validation were aware of these

3  grievances. Nor has he alleged facts to suggest that his gang validation was motivated

4  by these grievances. Although some of the grievances were submitted shortly before

5  Plaintiff received information regarding his gang validation and was interviewed by

6  Defendant Turmezi, Plaintiff's lengthy history of filing grievances during his entire

7  incarceration at CCI undermines any inference of suspect timing. Lastly, because

8  Plaintiff's gang validation is supported by some evidence, Plaintiff cannot allege that the

9  validation was unrelated to any legitimate penological goal.

10  Plaintiff argues that Defendants must be held liable for the allegedly retaliatory

11  gang validation because he repeatedly claimed that the validation was retaliatory and

12  that the materials seized from his cell were not his. This is not sufficient to state a claim.

13  As stated above, Plaintiff must allege facts to show that the named Defendants took

14  adverse action against him because of his protected conduct, that the action would chill

15  a person of ordinary firmness, and that the action did not reasonably advance a

16  legitimate correctional goal. Rhodes, 408 F.3d at 567-68. His assertion that he told

17  Defendants that the validation was retaliatory does not establish that it was retaliatory.

18  Plaintiff previously was advised on this standard and the requirements for

19  correcting deficiencies in his original complaint. Nevertheless, his first amended

20  complaint contains nearly identical factual allegations as his original complaint. Plaintiff's

21  failure to cure noted deficiencies is reasonably construed as reflecting his inability to do

22  so. Further leave to amend would be futile and should be denied.

23  **VII.    CONCLUSION AND RECOMMENDATION**

24  Plaintiff's first amended complaint fails to state a cognizable claim. He previously

25  was advised of pleading deficiencies and afforded the opportunity to correct them. He

26  failed to do so. Any further leave to amend reasonably appears futile and should be

27  denied.

28

1   The undersigned recommends that the action be dismissed with prejudice, that
2   dismissal count as a strike pursuant to 28 U.S.C. § 1915(g), and that the Clerk of the
3   Court terminate any and all pending motions and close the case.

4   The findings and recommendation will be submitted to the United States District
5   Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).
6   Within fourteen (14) days after being served with the findings and recommendation, the
7   parties may file written objections with the Court. The document should be captioned
8   "Objections to Magistrate Judge's Findings and Recommendation." A party may respond
9   to another party's objections by filing a response within fourteen (14) days after being
10  served with a copy of that party's objections. The parties are advised that failure to file
11  objections within the specified time may result in the waiver of rights on appeal.
12  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923
13  F.2d 1391, 1394 (9th Cir. 1991)).

14

15

16  IT IS SO ORDERED.

17  Dated:   June 22, 2015          /s/ Michael J. Seng

18                                  UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28
                                    21